236 S.W.2d 409 (1951)
DAVIES
v.
MOTOR RADIO CO., Inc.
No. 21300.
Kansas City Court of Appeals. Missouri.
January 8, 1951.
*410 Clay C. Rogers, Lyman Field, Reed O. Gentry and William E. Tipton, all of Kansas City, for appellant.
Duvaul P. Strother, Kansas City, for respondent.
BROADDUS, Judge.
This is an action for consequential damages for breach of an alleged implied warranty arising from the sale to plaintiff by defendant of an electric refrigerating machine. Trial to a jury resulted in a verdict and judgment for plaintiff for $1,000, and defendant appealed.
The material allegations of the petition are: That sometime prior to May 17, 1946, plaintiff informed defendant that he desired to purchase "a walk-in icebox with an electric cooling and freezing unit" for the purpose of cooling and freezing approximately 2,000 pounds of meat at one time; that thereupon defendant informed plaintiff that it could install a box with units sufficient to suit the needs of the plaintiff, and plaintiff, relying upon such representations, did on or about May 17, 1946, purchase from defendant a combination cooler at the price and sum of $1,574, and thereafter defendant installed the cooler in the premises of plaintiff; that in August, 1946, plaintiff placed 963 pounds of prime beef in said cooler and thereafter, and on or about August 29, he placed 300 pounds of horse meat in the cooler and because the cooler "did not hold temperatures low enough to keep said meat frozen," all of it spoiled to plaintiff's damage in the sum of $750; that as a "further result of the failure of the equipment to maintain temperatures to keep the meat frozen," plaintiff was required to purchase meat in small quantities at a higher price to his damage in the sum of $250.
The answer pleaded the written contract of sale which was attached to the answer as an exhibit and made a part thereof. The contract contained, among other things, this provision: "No agreement or understanding, oral or written, which is not plainly written on this contract, before signature, shall qualify the terms thereof. The warranties and guaranties applicable to the above equipment shall be the standard warranties furnished by the manufacturers thereof, and no other." The answer also pleaded the warranty furnished by a company which manufactured part of the equipment in question. This warranty was given and signed by the Frigidaire Division of General Motors Corporation, the material part of which is: "We warrant every new Frigidaire Condensing Unit; and any new Frigidaire Equipment connected therewith, to be free from defect in material and workmanship under normal use and service, and we will, within one year from delivery to the original purchaser, replace without any cost to the customer, any part or portion thereof which our examination shall disclose to our satisfaction to be thus defective, * * *. This warranty does not apply to any material which has been subject to misuse, * * *; and we do not authorize any person or representative to assume for us any other liability in connection with our products." Other allegations in the answer are not material on the issues presented here.
Plaintiff's instruction No. 1 submitted the case to the jury on the theory of breach of an implied warranty that the refrigerating machine was reasonably fit for the purpose for which it was purchased, to-wit; the cooling and freezing of a specified quantity of meat.
Plaintiff's testimony shows that he is a veterinarian. In 1946, he received a letter from defendant advertising "walk-in coolers and freezers," and as he was interested in purchasing one he called defendant's office. Plaintiff used horse meat as food for some of the animals under his care. When Mr. Haid, defendant's manager, came to plaintiff's place of business, plaintiff told him he intended to slaughter horses and to freeze and store the meat in an electric refrigerator suitable for that purpose; that he wanted a "box" that would take care of 1,500 to 2,000 pounds of meat at one time, and one which would freeze the meat as well as "cool it out"; and that he also intended to slaughter beeves for his own use and freeze the meat and keep it in the box. Mr. Haid told him that defendant could furnish such a box, and showed him certain pictures, plans and specifications. Plaintiff *411 testified that while he informed Mr. Haid that he wanted a white enameled box with a door in the end, he did not undertake to pass on the plans or specifications exhibited to him; that he did not select any specific equipment; that he knew nothing about such equipment and relied on defendant to select, furnish, and install the proper size box, parts, and machinery to cool out and freeze the specified amount of meat. He admitted that he signed a contract of sale on March 17, 1946, the material parts of which are set forth below.
When the box was delivered, plaintiff was informed that it had been used as a demonstrator, but that it "was satisfactory, that it would work." The condensing unit was new. After the equipment was installed by defendant, plaintiff put four or five hundred pounds of beef in the box, but it took 36 hours to freeze one quarter of the beef. Plaintiff complained to defendant about the unsatisfactory operation of the machine and defendant attempted to remedy the situation and make the machine operate more satisfactorily. Thereafter, plaintiff put about 950 pounds of beef in the box, and the frost on the coils became so heavy that the machine would not function. A switch was installed and other work performed by defendant, but the machine was still unsatisfactory. Defendant's repair man told plaintiff that the coils in the box were "not big enough to take care of the job." The machine was never capable of cooling and freezing as much as 500 pounds of meat. On October 10, 1946, plaintiff was forced to dispose of 750 pounds of beef because it was spoiled. He offered evidence to show the extent of his damages.
Donald Bigbee, a refrigeration expert, testified for plaintiff that the equipment in question was insufficient to cool out 2,000 pounds of meat in 24 hours; that in his opinion it would take a week to freeze 2,000 pounds of meat, whereas meat should be frozen in 24 hours; and that the equipment was only capable of cooling, freezing, and keeping a quantity of meat equivalent to "a chicken a day or something like that." He said the condensing unit and coils were too small for a box the size of the one in question.
Defendant's evidence was as follows: Mr. Haid, defendant's manager, and Mr. Patterson, a salesman for defendant, testified that they went to plaintiff's place of business and made measurements and furnished drawings and specifications for the size box and equipment which they deemed necessary, and which defendant sold and installed; and that a picture of the box (Exhibit 2), the drawings (Exhibit 3), and specifications (Exhibit 4), were submitted to plaintiff at the time of the signing of the contract of sale. The drawings and specifications do not show or mention the condensing unit or indicate in any way the size or horsepower of that unit; and they do not specify the size of the coils.
Mr.Haid, defendant's representative, denied that plaintiff made any statement to him about wanting a freezer that would cool out and freeze 2,000 pounds of meat at one time; and also denied that he told plaintiff the box would take care of that amount of meat, but he did say that "according to the manufacturer's specification sheet the freezer compartment would take care of approximately 1,330 lbs. maximum capacity." He also testified: "* * * there are two component parts of this system, the box and its interior equipment, that is the coil, the plates, the thermostat, the shelves, racks and hooks, that is, the cooler we will say, is manufactured by United Refrigerator Company in St. Paul, Minnesota, shipped as a component unit not assembled. Everything is included, every bolt, nut and screw. Then the Frigidaire condensing unit is made by the Frigidaire Corporation and shipped in a separate crate to be applied to the unit out on the job. * * * The only thing that we selected in Dr. Davies's case was the size of the Frigidaire unit to refrigerate this cooler."
Mr. Monroe, a refrigeration engineer, testified that he assembled and installed the equipment at the request of defendant; that the various parts were new standard equipment; that the equipment "came through as a complete unit except the machine, and we furnished that, Motor Radio Company did." The "machine" referred to was the Frigidaire condensing unit. It was his opinion that the equipment was *412 capable of freezing meat properly and in due time.
Defendant contends that the contract of sale excluded all implied warranties and, therefore, that the court erred in overruling its motion for a directed verdict. It is also contended that the court erred in refusing to admit in evidence the manufacturer's warranty set forth above.
The record shows that the refrigerating machine consisted of two units. One unit was manufactured and shipped to defendant by the United Refrigerating Company of St. Paul, Minnesota. This unit included the box and certain equipment therein, such as the cold plates, blower coil, and thermostat. The other unit was the condenser, which included the motor. The condensing unit was manufactured and delivered to defendant by the Frigidaire Division of General Motors Corporation, Dayton, Ohio. As stated in defendant's brief, "the defendant delivered and assembled the two units at plaintiff's home. The two units assembled made up the cooler-freezer box." It also appears that defendant selected both of the units. We think the evidence clearly shows that defendant undertook to select the constituent parts of the refrigerating machine and to assemble and install the same as a complete machine, knowing that plaintiff relied upon it to furnish a machine which would cool out and freeze the specified quantity of meat.
It is settled law in this state that "where the seller, be he manufacturer or dealer, undertakes to supply an article for a particular purpose, knowing that the buyer trusts to his judgment that the article is suitable for that purpose, an implied warranty arises that the article is suitable for such purpose." Hunter v. Waterloo Gasoline Engine Company, Mo.Sup., 260 S.W. 970, 973. See 4, Williston, Contracts, sec. 989 (2d ed. 1936); 46 Amer.Jur. secs. 346, 349, pp. 529, 535; 55 C.J. sec. 719, p. 750; Overstreet, Some Aspects of Implied Warranties in the Supreme Court of Missouri, 10 Mo.L.Rev. 147. Cf. State ex rel. Jones Store Company v. Shain, 352 Mo. 630, 179 S.W.2d 19. However, we are confronted with defendant's contention that the written contract of sale "excludes all warranties except the standard warranties furnished by the manufacturer, and no other." There can be no doubt that a warranty will not be implied where the contract of sale excludes such warranties. Little v. Widener, 226 Mo.App. 525, 32 S.W.2d 116; Laitner Plumbing & Heating Co. v. McThomas, Mo.App., 61 S.W.2d 270; Belt Seed Co. v. Mitchelhill Seed Co., 236 Mo. App. 142, 153 S.W.2d 106.
The contract was introduced in evidence by defendant. It provided: "Please enter my order for the following equipment, which will be accepted under the conditions and terms set out below, which are hereby agreed to; 1 combination cooler$1574.00. Above to be installed by seller. Electrical wiring to be done by seller." Then follow the date for delivery of the equipment, method of payment, and these provisions: "No agreement or understanding, oral or written, which is not plainly written on this contract before signature, shall qualify the terms thereof. The warranties and guaranties applicable to the above equipment shall be the standard warranties furnished by the manufacturers thereof, and no other."
A written contract of sale may include a provision to the effect that the express agreement between the parties "covers all agreements" between them, or equivalent words. This is the so-called "merger clause." As stated, the contract in question provided that "no agreement or understanding, oral or written, which is not plainly written on the contract before signature, shall qualify the terms thereof." (Italics ours.) Some courts hold that such a provision excludes implied warranties because it applies to the implication which the law "reads into the contract," as well as to any special agreement between the parties outside the terms of the contract. Valley Refrigeration Co. v. Lange Co., 242 Wis. 466, 8 N.W.2d 294; S. F. Bowser & Co., Inc., v. Birmingham, 276 Mass. 289, 177 N.E. 268; McCabe v. Standard Motor Const. Co., 106 N.J.L. 227, 147 A. 466; Lasher Co. v. La Berge, 125 Me. 475, 135 A. 31; Sterling-Midland Coal Co. v. Great Lakes Coal & Coke Co., 334 Ill. 281, 165 N. *413 E. 793. Other cases support the view that such a provision does not, of itself, exclude implied warranties, since an implied warranty is not based on any agreement of the parties, but is an obligation imposed by law. National Cash Register Co. v. Van Duser Supply Co., 207 Mo.App. 454, 464, 232 S.W. 1091; Hobart Mfg. Co. v. Rodziewicz, 125 Pa.Super. 240, 189 A. 580; S. F. Bowser & Co. v. McCormack, 230 App. Div. 303, 243 N.Y.S. 442; Bekkevold v. Potts, 173 Minn. 87, 216 N.W. 790, 59 A.L.R. 1164; Minneapolis Steel & Machinery Co. v. Casey Land Agency, 51 N.D. 832, 201 N. W. 172; Lutz v. Hill-Diesel Engine Co., 255 Mich. 98, 237 N.W. 546; Rowe Mfg. Co. v. Curtis-Straub Co., 223 Iowa, 858, 273 N.W. 895; Liquid Carbonic Co. v. Coclin, 161 S.C. 40, 159 S.E. 461. We think the latter view is based on sound reasoning. See Williston, Contracts, secs. 643, 811A (2d ed. 1936.)
However, the defendant also relies upon the provision which reads: "The warranties and guaranties applicable to the above equipment shall be the standard warranties furnished by the manufacturers thereof, and no other." Under the evidence the "above equipment" consisted of two separate units, one made by one manufacturer, the other by another. All that the above provision means when applied to the facts here is that defendant assumed "no other" warranty as to each particular unit except that given by the manufacturer thereof. This was not inconsistent with and thus did not exclude the implied warranty that the two units when assembled and installed by defendant as a completed machine would be suitable for the purpose intended. The implied warranty of fitness was wholly independent of anything contemplated in the express warranty of the manufacturer. The latter warranty related not at all to the working or functioning of the completed machine.
It is our opinion that under the particular facts and situation presented in this case that the sale contract does not prevent plaintiff from proving an implied warranty which will bind defendant, and we hold that the evidence is sufficient to make a submissible issue of an implied warranty.
We also take the view that the facts of this case distinguish it from the cases of Little, Laitner Plumbing & Heating Co., and Belt Seed Co., supra. Nor is the case of Crossan v. Noll, Mo.App., 120 S.W.2d 189, in point. There the mortgage excluded "implied" warranties.
Defendant offered in evidence the warranty given by the Frigidaire Division of General Motors Corporation, the material part of which is set forth above. It is contended that the court erred in excluding that warranty. An express warranty in a contract of sale does not necessarily exclude all implied warranties. The weight of authority is that an implied warranty is not excluded by an express warranty unless it is inconsistent therewith. Hunt v. Sanders, 313 Mo. 169, 281 S.W. 422; Brandtjen & Kluge v. Hunter, 235 Mo.App. 909, 145 S.W.2d 1009; National Cash Register Co. v. Van Duser Supply Co., 207 Mo. App. 454, 232 S.W. 1091; Advance Rumley Thresher Co. v. Briggs Hardware Co., 202 Mo.App. 603, 206 S.W. 587; 164 A.L.R. 1321. The warranty in question was limited to "new Frigidaire condensing unit, and any new Frigidaire equipment connected therewith * * *." This condensing unit constituted only a part of the electric refrigerating machine sold by defendant to plaintiff. There was no evidence of any warranty given by the manufacturer of the other unit. Any warranty given by the manufacturer of a particular item of equipment which merely formed a part of the refrigerating machine would not be inconsistent with or exclude an implied warranty that the complete outfit as assembled and installed by defendant was fit for the particular purpose for which it was sold. Since the warranty given by the Frigidaire Company, and adopted and given by defendant as its own express warranty, would not of itself exclude the implied warranty claimed by plaintiff, the action of the trial court in excluding the warranty was in no way prejudicial to defendant.
Defendant assails plaintiff's instruction No. 1, first, because it is based solely upon the theory of breach of implied warranty, whereas, the sale contract excluded any implied warranties. What we *414 have said disposes of this point. The second error charged is that the petition pleaded an "oral representation" which amounted to an express warranty, and, therefore, the "implied warranty" theory does not apply. We do not agree with this construction of the petition. It may not be a model pleading, but it does set forth the facts concerning this sale, the purpose for which plaintiff purchased the icebox, and that defendant knew what that purpose was, and the evidence was presented on that theory without objection. Under such circumstances, we are of the opinion that the petition sufficiently pleaded an implied warranty. The third criticism of the instruction is that it did not require the jury to find that the plaintiff relied upon the judgment of the defendant as to the fitness of the equipment; that such reliance is an essential element of an implied warranty and the instruction should have included that element.
It is unnecessary to copy the instruction in full. Suffice it to say that it does not require the jury to find that the plaintiff relied upon the judgment of the defendant in the purchase of the unit. The cases hold that one of the essential elements of an implied warranty of fitness for a particular purpose must, and necessarily does, depend upon whether the buyer relied upon the skill or judgment of the seller; and this is a question of fact which is ordinarily to be determined by a jury under appropriate instructions. 46 Am.Jur., p. 532, Sec. 348. The cases of Hunter v. Waterloo Gasoline Engine Co., supra, and State ex rel. Jones Store Co. v. Shain, 352 Mo. 630, 179 S.W.2d 19-21, hold that, in this particular type of implied warranty, there are two essential factors required: (1) the seller undertakes to furnish an article for a particular purpose, and (2) the buyer relies on the seller's judgment.
Plaintiff recognized these two essentials because the petition alleged that he informed the defendant of the special purpose for which this machine was to be used, and that he relied upon the assurances of defendant that the machine would fulfill such special purpose; he also testified that he had no knowledge concerning the fitness of the machine for his special purpose and that he relied upon defendant's judgment. We are of the opinion that plaintiff's instruction No. 1 failed to submit an essential element of his case. It is uniformly held that a plaintiff is required to embody in an instruction, wherein he undertakes to cover the whole case, all of the elements necessary for his recovery. Griffith v. Delico Meat Products Co., 347 Mo. 28, 145 S.W.2d 431, 435, and cases there cited. In support of his instruction plaintiff says that he substantially followed an instruction given in Perry v. Van Matre, 176 Mo.App. 100, 161 S.W. 643. That case can be distinguished on the issues and the evidence, but suffice it to say that the criticism urged against the instruction did not concern the question of whether the purchaser relied upon the superior knowledge of the seller. The court did not discuss or pass on that question in the Perry case. Plaintiff also cites the case of Carter v. St. Louis Dairy Co., Mo.App., 139 S.W.2d 1025. There plaintiff purchased from defendant a bottle of buttermilk which contained pieces of glass. It was undisputed that plaintiff relied upon the implied warranty that the milk was free from dangerous substances. It is not necessary that an instruction submit a matter which is, in effect, conceded. In the case at bar whether plaintiff relied upon the judgment of defendant as to the fitness of the machine was sharply contested. For this reason, the Carter case is not in point. For the reasons assigned, plaintiff's instruction No. 1 was erroneous.
Since this case may be retried, we express the opinion that plaintiff's evidence concerning his special damage due to the purchase of horse meat in small quantities, is so indefinite, uncertain and speculative that such issue should not again be submitted to the jury unless his evidence is sufficiently definite and certain to warrant the inclusion of that element of damage.
For the reasons assigned, the judgment is reversed and the cause remanded.
All concur.