Kirk WALLACE, a Minor, by his Next
Friend, Vernon Wallace,
Appellant,

v.

KNAPP-MONARCH COMPANY, a
Corporation, Appellee.

No. 15439.

United States Court of Appeals
Eighth Circuit.

June 26, 1956.

854

William R. Schneider, St. Louis, Mo. (Joseph A. Kirkwood and J. Edward Gragg, St. Louis, Mo., were with him on the brief), for appellant.

John S. Marsalek, St. Louis, Mo. (Moser, Marsalek, Carpenter, Cleary & Carter, St. Louis, Mo., were with him on the brief), for appellee.

Before SANBORN, JOHNSEN and VOGEL, Circuit Judges.

VOGEL, Circuit Judge.

Plaintiff-appellant, Kirk Wallace, was at the time with which we are concerned herein an infant of the age of 7 weeks. He was a resident of the State of Missouri. The defendant-appellee is a corporation organized under the laws of the State of Delaware and licensed to do business in the State of Missouri. Diversity of citizenship and the statutory amount satisfy jurisdictional requirements. The action is one for damages by reason of personal injuries sustained by the plaintiff on November 8, 1951, as a result of being very seriously scalded by steam or boiling water from a vaporizer manufactured by the defendant.

At the time of the accident, the vaporizer was standing on the floor beside the foot of the crib in which the plaintiff was lying, its steam nozzle pointing toward the head of the crib. The vaporizer was plugged into an electric outlet on the wall, the cord extending under the crib. The mattress of the crib on which the plaintiff was lying was about 18 inches above the floor. The upper structure of the crib consisted of slender upright posts about 3 inches apart and to a height of 30 inches, encircling the outer edge of the crib to the top rail. The vaporizer was purchased by the plaintiff's neighbor from one of the defendant's retail outlets in St. Louis, the purchase being made during the winter of 1949. It was used by this neighbor a number of times and then stored in its original package with its instruction sheet.

On November 7, 1951, it was borrowed from the neighbor by plaintiff's father and later purchased by him from the neighbor. The vaporizer and the instruction sheet were then still in the original container. Plaintiff had been suffering from a cold and the attending physician had recommended the use of a vaporizer. Plaintiff's parents read the instruction sheet and placed the vaporizer in operation during most of November 7, 1951, and again on the morning of November 8th, refilling it from time to time to the two-hour mark. At about 1:15 p. m. on

November 8th plaintiff's mother again placed water in the vaporizer. At 1:45 p. m. she checked and observed the vaporizer operating normally. She returned to work in the kitchen, at which time she heard the plaintiff begin to whimper. She called to her oldest son, Donnie, at that time 6 years old, to go "check on the baby". Donnie responded, opened the door to the plaintiff's bedroom and stepped in. He then called to his mother. At the same time plaintiff began screaming. The mother rushed into the plaintiff's bedroom, saw the lid of the vaporizer inside the crib and the plaintiff and his bed clothing wet with water and the plaintiff very badly scalded. She unplugged the vaporizer, which remained in the same position it was at the time she had checked it at 1:45 p. m. She believed there was still a little water in the vaporizer. Plaintiff's brother Donnie, who at the time of the trial was 9 years of age, testified that as he opened the bedroom door he saw the lid of the vaporizer and the water go up in the air. He had called to his mother and said, "Mother, the thing went up."

The vaporizer is a cylindrical vessel made of ordinary commercial type sheet aluminum of the same kind used in ordinary kitchen utensils. It is about 8½ inches high and 5 inches in diameter. On top is a lid, which fits loosely into the body or container, there being a clearance of 1/16th of an inch all around between the part of the cover which fits down into the container and the container itself. The lid or cover was equipped with a knob at the top and a conical-shaped spout, the opening at the outer end of which is slightly larger than ¼th of an inch in diameter.

The lower section of the container is divided from the upper section by an aluminum sheet. Below this sheet is an asbestos pad, and below the pad is the heating element, which is a ceramic disc in which two complete turns of the heating wires are embedded. In the lower section there is a thermostat, which cut off the current when the heat reached 350 degrees Fahrenheit. The bottom of the lower section and of the device itself is made of aluminum. On the side of the container are indicators marked "3 HRS", "2 HRS" and "1 HR", showing the water level necessary for the operation of the vaporizer for the specified periods, also an indicator at the bottom marked "Dry".

The vaporizer instruction sheet, Exhibit A, contained the following:

"Don't operate vaporizer in the room of a helpless person, an infant, an invalid, a sleeping or unconscious person unless carefully and constantly attended."

According to the defendant's chief engineer, who helped design the vaporizer in question, such instruction was to caution people against possible accidents, such as that a child playing might come near the vaporizer and upset it and burn someone or a pet might run through the room and get caught on the cord and knock it over. He claimed the instruction was not issued because there was any possibility of explosion or eruption.

The vaporizer in question was examined by a number of persons. Vernon Wallace, father of the plaintiff, ran tests on the vaporizer at his garage. He "never got any sort of output of water from it". "It seemed to steam properly." Mr. Wallace took the vaporizer to Dr. Bernard Breck, a chemist, who made tests but who was not called to testify. A professor connected with St. Louis University also made tests in behalf of plaintiff but was not called to testify.

George F. Mues, electric appliance repairman and manager of the Kaemmerlen Electric Company, examined the vaporizer at the request of the plaintiff's mother. During all of his tests the vaporizer worked properly. As one experiment, the spout was plugged so that the vapor or steam could not escape through it and was forced to come out around the edge of the lid. This would cause "a little jiggle or wriggling of the lid when we plugged the spout". At no time did any water come out of any part of the kettle or out of the spout. Mues was not called

in behalf of the plaintiff but was called by the defendant and testified in its behalf.

Donald Chamberlain, consulting engineer and Professor of Chemical Engineering at Washington University, testified in behalf of the defendant. He had been asked to try by experiments to duplicate the claimed explosion of the vaporizer in question. He was unable to do so although, "The tests I made took me approximately five days and they were over a period of ten days * * *." The witness was then asked a hypothetical question based upon the physical findings before and immediately after the accident. He was asked:

"Q. Will you give us your opinion then as to whether this could happen through any action or operation of the vaporizer itself?"

To which the witness answered:

"A. I do not believe that it could possibly have happened that way."

Alfred Huck testified that he was chief engineer for the defendant. He had a major part in designing the vaporizer in question. It has been on the market since 1947 and just over a half million had been sold. He testified to the development of the vaporizer and the many tests to which it was subjected before it was put on the market. He testified:

"Q. Mr. Huck, in your experience in testing these vaporizers which you yourself designed and putting them through their original test, and putting them through these production tests on the actual production models as they come off the line, have you ever had one erupt or blow a lid off? A. No, sir, I have not."

He examined the particular vaporizer in question at the plaintiff's home on December 31, 1951. He was asked the same question as had been put to Dr. Chamberlain, the chemical engineer. In reply, he stated:

"My opinion is that it is absolutely impossible to."

On cross examination, he testified as follows:

"Q. Mr. Huck, if this eruption occurred as the witness testified you have no explanation for it, is that true, other than to say that it is your opinion it does not happen that way; do you have any other explanation for it? A. As I wrote in a report as soon as I returned from the examination of the appliance, I can see no other explanation other than it would accidently have been knocked over or dropped or spilled in some manner.

"Q. You mean by someone physically taking charge of this hot and boiling refrigerator, picking it up and dumping it over on the child, is that what you mean to say? A. Some physical condition like someone externally taking it and having an accident with it, bumping it or something.

"Q. But if that did not occur then you have no explanation as to how this could have happened? A. That is right."

At the conclusion of plaintiff's case defendant moved for a directed verdict. At the conclusion of all the evidence defendant renewed the motion for a directed verdict and the trial court reserved ruling thereon. The case was submitted to the jury, which failed to agree and was discharged, and the case was continued. Defendant then moved for judgment in accordance with its motion for a directed verdict. At the same time plaintiff made an oral request for leave to amend his petition to add a local defendant. On June 13, 1955, the trial court entered its order denying plaintiff's oral request for leave to amend the petition and add a local defendant and granting the motion of the defendant for judgment in accordance with its motion for a directed verdict. Appeal from the court's order of June 13, 1955, was taken to this court.

The case here presents but two substantial questions: (1) Did the District

Court err in sustaining defendant's after-trial motion for judgment in accordance with its trial motion for directed verdict? (2) Did the District Court err in denying plaintiff's oral request for permission to join a local retailer as a defendant, submitted with defendant's after-trial motion for judgment? We will now consider the first question.

■■■ We are controlled herein by the law of the State of Missouri. Ramsel v. Ring, 8 Cir., 1949, 173 F.2d 41; Lachman v. Pennsylvania Greyhound Lines, 4 Cir., 1947, 160 F.2d 496; Erie R. Co. v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 826, 82 L.Ed. 1188. Plaintiff, of course, has the burden of establishing that the District Court erred in applying the law of the State of Missouri. In dealing with such questions, we said, in Western Casualty & Surety Co. v. Coleman, 8 Cir., 1950, 186 F.2d 40, 43:

"* * * in reviewing doubtful questions of local law, we would not adopt views contrary to those of the trial judge unless convinced of error, and that all that this Court reasonably can be expected to do in such cases is to see that the determination of the trial court is not induced by a clear misconception or misapplication of the local law. Russell v. Turner, 8 Cir., 148 F.2d 562, 564; Buder v. Becker, 8 Cir., 185 F.2d 311, 315, and cases cited. If a federal district judge has reached a permissible conclusion upon a question of local law, we will not reverse, even though we may think the law should be otherwise."

Plaintiff's complaint bases his asserted right of recovery on two theories: (1) That of general negligence supported by the *res ipsa loquitur* doctrine; and (2) the breach of an implied warranty of fitness for use. In submitting the case to the jury, the trial court did so exclusively on the general negligence or *res ipsa loquitur* theory and refused to submit instructions on the theory of warranty of fitness for the purpose for which the vaporizer was sold. In McIntyre v. Kansas City Coca Cola Bottling Co., D.C.W.D.Mo.W.D.1949, 85 F.Supp. 708, at page 714, the court, after noting there was no Missouri Supreme Court ruling directly in point and comparing State ex rel. Jones Store Co. v. Shain, 1944, 352 Mo. 630, 179 S.W.2d 19, and Zesch v. Abrasive Co. of Philadelphia, 1944, 353 Mo. 558, 183 S.W.2d 140, 156 A.L.R. 469, with other cases, said:

"Regardless of supposition, it clearly appears from a consideration of the foregoing authorities of the Supreme Court of Missouri, that the convincing manifestation to be drawn from the 'definitive law' and 'considered dicta' of that Court, is that the doctrine of implied warranty of 'merchantability' would not be extended to include the donee of a vendee of a retail vendor, or applied against the remote manufacturer of a product such as here involved. That the rule as to liability in cases such as the instant one rests in tort, in Missouri, under the doctrine of res ipsa loquitur, and that the mind of the Supreme Court of Missouri is that such a rule of liability 'is sane, logical, reasonable, and practical, and in accord with the rule of decision in (that) state.' Stolle v. Anheuser-Busch, Inc., 307 Mo. 520, 271 S.W. [497] loc. cit. 500, 39 A.L.R. 1001. See also Riecke v. Anheuser-Busch Brewing Ass'n, 206 Mo.App. 246, 227 S.W. 631; Kees v. Canada Dry Ginger Ale, Inc. [239 Mo.App. 1080] 199 S.W.2d 76; Stephens v. Coca-Cola Bottling Co., Mo.App., 215 S.W.2d 50."

■■■ The trial judge herein was of the same opinion. He reached a "permissible conclusion" upon a question of Missouri law. Accordingly, if the plaintiff is to recover at all, under the circumstances presented here, his recovery must be in tort under the doctrine of *res ipsa loquitur*.

The Supreme Court of Missouri, in Charlton v. Lovelace, 1943, 351 Mo. 364, 173 S.W.2d 13, 17, stated:

" 'The doctrine [of *res ipsa loquitur*] is applicable only where the physical cause of the injury and the attendant circumstances indicate such an unusual occurrence that in their very nature they carry a strong inherent probability of negligence and in the light of ordinary experience would presumably not have happened if those who had the management or control exercised proper care. Accordingly the mere occurrence of an unusual or unexplained accident or injury, if not such as necessarily to involve negligence, does not warrant the application of the doctrine, and it has been held that the doctrine does not apply where the act which caused the injury was beyond doubt the voluntary and intentional act of some person. Furthermore, the rule cannot be invoked where the existence of negligence is wholly a matter of conjecture, and the circumstances are not proved, but must themselves be presumed.' 45 C.J. p. 1211, § 778; Hart v. Emery-Bird-Thayer Dry Goods Co., 233 Mo.App. 312, 118 S.W.2d 509, 512.

" 'The character of the accident rather than the fact of the accident, determines whether the doctrine of res ipsa loquitur applies.' 15–16 Huddy's Cyc. of Automobile Law, 9th Ed., § 157; Harke v. Haase, supra [335 Mo. 1104, 75 S.W.2d 1001]."

See also Brown v. St. Louis County Gas Co., Mo.App.1939, 131 S.W.2d 354, 359:

"So it is that however unusual or extraordinary the occurrence itself may have been, the case will nevertheless not fall within the doctrine of res ipsa loquitur unless the agency or instrumentality producing the injury was under the exclusive management and control of the defendant, or subject to his right of control, at the time the negligence was committed. McCloskey v. Koplar, supra [329 Mo. 527, 46 S.W.2d 557, 92 A.L.R. 641]; Pandjiris v. Oliver Cadillac Co., supra [339 Mo. 711, 98 S.W.2d 969]. Accordingly there is no room for the application of the doctrine where the defendant did not have exclusive management and control, or the right of such control, at the time of the occurrence of the negligent act, as, for instance, where the agency or instrumentality producing the injury was either partly or entirely under the actual control and management of the plaintiff himself. 45 C.J. 1214–1216."

It is thus apparent that the Missouri interpretation of the rule coincides with the general view that the doctrine is not applicable where the control or right of control of the instrumentality causing the injury was not in the defendant at the time of the injury. In Gibbs v. General Motors, 1942, 350 Mo. 431, 166 S.W.2d 575, at page 581, the court said:

"*In all the reported cases* called to our attention and those we find by our own research, where the res ipsa rule has been applied, the instrumentality or thing complained of was generally in the possession and control of the defendant, *except where bottles exploded.* And the res ipsa doctrine is based in part upon the theory that the one in charge of an instrumentality which causes injury either knew the cause or has the best opportunity of ascertaining." (Emphasis supplied.)

No case has been cited to us and we have found none which would serve to subsequently alter this rule in Missouri. See Hall v. Lewis, 1954, 364 Mo. 1096, 272 S.W.2d 260.

Defendant considers the Gibbs case adequate to dispose of this issue because it was not and had not been in control of the steamer for a number of years prior to the accident. Plaintiff would supply this lack of technical control by adverting to admissions by defendant that the

steamer at the time of the suit was in substantially the same condition as when new. This fact, it is argued, shows " * * * that there is and then was some defect in the manufacture of the vaporizer which did on the occasion in question demonstrate itself when being used in accordance with the defendant's directions". Plaintiff cites Maybach v. Falstaff Brewery Corp., 1949, 359 Mo. 446, 222 S.W.2d 87, 90, a bottle explosion case wherein the court stated the rule in some jurisdictions to be that:

" * * * it is sufficient to prove that the instrumentality was in the possession and control of the defendant *at the time the negligent act was committed,* together with further proof of the absence of any cause intervening between the negligent act and the injury. (45 C.J., p. 1214, sec. 781; Soter v. Griesedieck Western Brewery Co. [200 Okl. 302] 193 P.2d 575, 4 A.L.R.2d [458] 466.)"

See also Kees v. Canada Dry Ginger Ale, 1947, 239 Mo.App. 1080, 199 S.W.2d 76.

In the Maybach case, the court refers to Stolle v. Anheuser-Busch, 1925, 307 Mo. 520, 271 S.W. 497, 39 A.L.R. 1001, supra, wherein they had allowed the *res ipsa loquitur* doctrine to apply where the plaintiff was injured by the explosion of a bottle of beer bottled and sealed by the defendant and where there was a showing that the explosion of the bottle was not caused by negligent handling of any person after it left the possession of the defendant. In referring to the Stolle case, the Missouri court said, at page 90 of 222 S.W.2d:

"We think the result reached in sustaining the petition in the Stolle case is correct, because the petition states a cause of action for general negligence. *But we think the opinion extends the res ipsa doctrine too far and farther than we have been willing to extend it in other cases.* Gibbs v. General Motors, 350 Mo. 431, loc. cit. 442, 166 S.W.2d 575. See also 38 Am.Jur., p. 996, sec. 300; Brown v. St. Louis County Gas Co.,

Mo.App., 131 S.W.2d 354, 359." (Emphasis supplied.)

The opinion then goes on to say:

"An essential element of the res ipsa doctrine is that proof of the occurrence and attendant circumstances shall point, prima facie, to negligence on the part of the defendant. Such proof cannot, without further proof, point to the negligence of a defendant who is entirely out of control of the instrumentality at the time it causes the injury. Such proof may tend to indicate negligence on the part of *some one,* but further proof is necessary to definitely fix the blame on the defendant by excluding causes for which he is not responsible."

■ Although the precise ramification of this language is not readily apparent, we find nothing to connote a rule upon which recovery may be founded in the case at bar. The latter-quoted portion merely asserts an exception to the usual requirement of control in a sealed bottle case. That is not the instant situation. We do not agree that merely because the steamer here involved is admittedly in the same condition as when purchased there is a presumption of defective manufacture arising when it exudes water or operates inordinately. Assuming that the steamer did emit steam or water, as we must do, that does not "point, prima facie, to negligence on the part of defendant". Maybach v. Falstaff Brewery Corp., supra, 222 S.W.2d at page 90. The happenstance merely illustrates that an accident occurred, either by negligence of someone or by a latent, intervening act.

■ Any supposition that the emission was a result of inherent defects in manufacture is indulgence in mere speculation and conjecture. Niswander v. Kansas City Gas Co., Mo.App.1944, 181 S.W.2d 165, 167–168; Charlton v. Lovelace, 1943, 351 Mo. 364, 173 S.W.2d 13, 20, supra; Kees v. Canada Dry Ginger Ale, 1947, 239 Mo.App. 1080, 199 S.W.2d 76, 79, supra. Plaintiff was in a better

position to show the circumstances causing the injury and defendant is not possessive of any superior knowledge. To hold that the *res ipsa loquitur* rule is applicable here would be to extend the doctrine to situations to which the Missouri decisions have not extended it, and that we cannot do.

The Missouri Supreme Court, in the Maybach case in 1949, has already indicated that their 1925 decision in the Stolle case allowing recovery where the exploding bottles were out of the possession of the defendant " * * * extends the res ipsa doctrine too far * * * ." The trial judge herein did not write a memorandum in this case. It is patent, however, that in granting the defendant's after-trial motion for judgment he concluded that under the law of Missouri the doctrine of res ipsa loquitur was not applicable to the situation presented herein. We believe he was correct in so ruling.

Plaintiff raises the point that the trial court erred in denying his oral request, submitted after trial, for permission to join a local retailer as defendant. This oral request apparently was made at the same time the defendant made its motion for judgment but before any ruling had been obtained thereon. By the granting of such a motion, the court would have lost jurisdiction as there then would have been no diversity of citizenship. Highway Construction Co. v. McClelland, 8 Cir., 1926, 15 F.2d 187.

The issue falls within the precautionary orbit of the language in St. Paul Mercury Indemnity Co. v. Red Cab Co., 1938, 303 U.S. 283, 58 S.Ct. 586, 82 L.Ed. 845, wherein the Supreme Court was dealing with jurisdiction of a district court acquired through removal where plaintiff subsequently reduced his claim to less than the jurisdictional amount. The court stated, 303 U.S. at page 294, 58 S.Ct. at page 593:

"If the plaintiff could, no matter how *bona fide* his original claim in the state court, reduce the amount of his demand to defeat federal jurisdiction the defendant's supposed statutory right of removal would be subject to the plaintiff's caprice."

An unqualified right to join resident defendants would likewise subject defendant's right of removal to the same vagaries. Pacific Gas & Electric Co. v. Fibreboard Products, D.C.N.D.Cal.1953, 116 F.Supp. 377. It was discretionary with the trial court to grant or deny the request. We do not consider it an abuse of discretion for the trial judge to refuse to allow joinder which would oust the court's jurisdiction where plaintiff originally permitted the case to go to trial and only when the outcome loomed as unfavorable moved to join the resident defendant. The important aspect which distinguishes this case from those relied on by appellant, e. g., Highway Construction Co. v. McClelland, 8 Cir., 1926, 15 F.2d 187; Galbraith v. Bond Stores, Inc., D.C.W.D.Mo.1945, 4 F.R.D. 319; Schindler v. Wabash R. Co., D.C.W.D. Mo.1949, 84 F.Supp. 319; Rowland v. Sellers, D.C.E.D.Tenn.1953, 111 F.Supp. 5, is that here the leave to amend was denied while in the cited cases it was granted. There is no inherent right of a plaintiff to have leave to amend where the ends of justice would not be aided. Rule 15(b), Federal Rules of Civil Procedure, 28 U.S.C.A. Here the case had been tried to a jury with a resultant disagreement and the court had before it defendant's motion for judgment in accordance with its motion for a directed verdict. To have allowed an amendment at this late date, which would have caused the court to lose jurisdiction, would have been in hindrance of rather than in aid of justice. The court properly exercised its discretion in denying the motion to amend.

Affirmed.